**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| HAYK BARSEGHYAN,<br>*Petitioner*,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney<br>General,<br>*Respondent.* | No. 16-72849<br><br>Agency No.<br>A205-533-215<br><br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted June 15, 2022
San Francisco, California

Filed July 8, 2022

Before:  Sidney R. Thomas, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Immigration

Granting Hayk Barseghyan's petition for review of the Board of Immigration Appeals' dismissal of his appeal of an Immigration Judge's denial of his application for asylum and related relief, the panel held that three out of four inconsistencies the BIA relied upon in upholding the IJ's adverse credibility determination were not supported by the record, and remanded on an open record for the BIA to determine in the first instance whether the remaining inconsistency was sufficient to support the adverse credibility determination.

The panel agreed with Barseghyan that there was no inconsistency between his testimony and declaration regarding how he arrived at the hospital after being tortured. The panel concluded that Barseghyan's ability to leave Armenia was also not inconsistent with his testimony that police wanted to see him again and would call him back for further questioning. The panel concluded that the BIA also erred by relying upon a purported inconsistency regarding Barseghyan's distribution of anti-government drawings because there was in fact no inconsistency, and the IJ did not rely on that ground. Moreover, the BIA did not provide a specific reason for rejecting Barseghyan's reasonable explanation for it.

The panel held that substantial evidence did not support the IJ's reliance upon insufficient corroborating evidence as

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a basis for finding Barseghyan not credible because the IJ categorically ignored documents that were consistent with Barseghyan's testimony. The panel explained that by ignoring such evidence, the IJ did not consider "the totality of the circumstances" when making the adverse credibility determination.

The panel held that the BIA further erred by misinterpreting the IJ's holding regarding corroborating evidence as relying on 8 U.S.C. § 1158(b)(1)(B)(ii), and by erroneously characterizing the IJ's holding as concluding that Barseghyan did not provide sufficient corroborating evidence to sustain his burden of proof independent of his own non-credible testimony, when the IJ actually relied upon the lack of documentation as one factor supporting its adverse credibility determination under 8 U.S.C. § 1158(b)(1)(B)(iii). The BIA thus erred by affirming a finding that the IJ did not make.

The panel held that the record did support the agency's finding of an inconsistency concerning whether Barseghyan was arrested at his home or at a police station. Noting that in *Alam v. Garland*, 11 F.4th 1133 (9th Cir. 2021) (en banc), the en banc court declined to decide how many inconsistencies require sustaining or rejecting an adverse credibility determination, the panel similarly declined to engage in line drawing here and emphasized that all but one inconsistency relied upon by the BIA were not supported by the record. The panel remanded on an open record for the BIA to determine in the first instance whether this remaining inconsistency was sufficient to support the adverse credibility determination.

The panel did not reach the BIA's holding concerning Barseghyan's eligibility for protection under the Convention

Against Torture because it was based upon the IJ's adverse credibility determination and should be reviewed further on remand.

## COUNSEL

Kevin W. Harris (argued), Sacramento, California; Ryan Friedman, Friedman Law Firm Inc., Sacramento, California; for Petitioner.

Brooke M. Maurer (argued), Trial Attorney; Nancy E. Friedman, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

GOULD, Circuit Judge:

Hayk Barseghyan, a native and citizen of Armenia, petitions this Court for review of a decision by the Board of Immigration Appeals ("BIA") dismissing his appeal of the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and relief from removal under the Convention Against Torture. The BIA affirmed based upon the IJ's adverse credibility determination. We grant Barseghyan's petition for review because three out of four inconsistencies relied upon by the BIA are not supported by the record. We remand on an open record for the BIA to determine in the first instance whether the remaining inconsistency is sufficient to support the adverse credibility determination.

## BACKGROUND

Barseghyan alleges that he suffered persecution and torture from the Armenian government because of his political opinion.  He is a member of HZhk, the anti-government opposition party also known as the People's Party of Armenia.  Barseghyan participated in a peaceful demonstration in 2008 to contest the results of an election. The police began to shoot at and attack protestors, and Barseghyan was struck on the head with a police baton and lost consciousness.  A neighbor, Zakharyan Mesrop, saw him fall and was able to pull him to safety.

Barseghyan was concerned about reports of the government buying votes in the next election.  He wanted to remind people what happened in and after the 2008 election. Barseghyan's wife made drawings at his request, depicting government corruption in the 2008 election and the government's violence at the protest.  He displayed these anti-government drawings in a bazaar on January 19, 2013, and distributed photocopies of the drawings.

A few days later, on January 23, he claims the police arrested him, questioned him for a few hours, and then released him.  He was told to "change [his] mind" about the drawings and that he would be called back for additional questioning.

A week later, he was called back to the police station where he was asked to say that the opposition party was planning to attack the police.  Because this was untrue, he refused, at which point he was taken to a different location where he claims he was beaten by members of the National Security Service.  Barseghyan described that he was physically beaten, drugged, forced to strip, put in a cold shower, and had bright lights shined in his face, among other

things.  He was asked repeatedly to sign a blank document, which he refused.  The National Security Service took his identification card affiliating him with the opposition party. Officials started beating him again, and he lost consciousness.  If all this was believed, he clearly showed past persecution.  *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1134 (9th Cir. 2004) (granting petition where petitioner had been beaten by government officials for demonstrating against the government); *Ahmed v. Keisler*, 504 F.3d 1183, 1194 (9th Cir. 2007) (same); *see also Kaur v. Wilkinson*, 986 F.3d 1216, 1222 (9th Cir. 2021) ("The hallmarks of persecutory conduct include, but are not limited to, the violation of bodily integrity and bodily autonomy.").

Barseghyan regained consciousness at the hospital. When he was released from the hospital, a police officer allegedly told him not to tell anyone what happened and to say instead that he got into a fight.  He was told that he would be "contacted for future 'interrogations'" and that if he continued distributing anti-government art he would be "severely punished."

Barseghyan fled Armenia and applied for admission to the United States from Mexico without a valid entry document.  The Department of Homeland Security ordered him removed and issued a Notice to Appear.  Barseghyan conceded removability and filed an application for asylum, withholding of removal, and protection under the Convention Against Torture.  He submitted a declaration with his application and also testified at a merits hearing.

The IJ found Barseghyan not credible and denied his claims for relief from removal.  In making the adverse credibility determination, the IJ relied upon three purported inconsistencies between Barseghyan's written declaration supporting his application and his oral testimony at the

hearing, as well as the lack of supporting documentation and the weakness of the documentation he did provide. The BIA dismissed Barseghyan's appeal based on the IJ's adverse credibility determination. Barseghyan timely petitioned for review, and we have jurisdiction under 8 U.S.C. § 1252.

## DISCUSSION

### A.

"Taking the totality of the circumstances into account, we review the BIA's credibility determination for substantial evidence." *Kumar v. Garland*, 18 F.4th 1148, 1153 (9th Cir. 2021); 8 U.S.C. § 1158(b)(1)(B)(iii). We review both "the reasons explicitly identified by the BIA" and "the reasoning articulated in the IJ's oral decision in support of those reasons." *Lai v. Holder*, 773 F.3d 966, 970 (9th Cir. 2014) (citation omitted). Prior to enactment of the REAL ID Act, we were required to sustain an adverse credibility finding so long as one of the agency's identified grounds was supported by substantial evidence and went to the heart of the claim. *Alam v. Garland*, 11 F.4th 1133, 1135 (9th Cir. 2021) (en banc). The REAL ID Act eliminated the "heart of the claim" requirement and imposed a "totality of the circumstances" standard in assessing credibility. *Id.* (citing 8 U.S.C. § 1158(b)(1)(B)(iii)). We have "no bright-line rule under which some number of inconsistencies requires sustaining or rejecting an adverse credibility determination." *Id.* at 1137.

If an IJ determines that a noncitizen is not credible, the IJ must provide "specific and cogent reasons" to support its adverse credibility determination. *Shrestha v. Holder*, 590 F.3d 1034, 1043, 1044 (9th Cir. 2010). The REAL ID Act permits IJs to consider factors such as demeanor, candor, responsiveness, plausibility, inconsistencies, inaccuracies, and falsehoods to form the basis of an adverse credibility

determination. *Id.* at 1044 (cleaned up). For each factor, the IJ should point to "specific instances in the record" that support the adverse credibility determination. *Id.*

If the IJ relies upon purported inconsistencies to make an adverse credibility determination, the IJ must provide the noncitizen with an opportunity to explain each inconsistency, although this opportunity can occur through direct or cross-examination. *Rizk v. Holder*, 629 F.3d 1083, 1088 (9th Cir. 2011), *overruled in part on other grounds by Alam*, 11 F. 4th 1133. If the noncitizen offers an explanation that is "reasonable and plausible," the IJ has to provide a "specific and cogent reason for rejecting" the explanation. *Id.* (citation omitted). But if the noncitizen does not provide a plausible explanation, or if the IJ reasonably rejects the proffered explanation, the IJ may rely on that inconsistency to make an adverse credibility determination. *Id.* In addition to the noncitizen's explanation, the IJ should also consider "other record evidence" that helps determine whether an inconsistency exists. *Shrestha*, 590 F.3d at 1044.

## B.

We grant Barseghyan's petition for review because three out of four inconsistencies the BIA relied upon in upholding the adverse credibility determination are not supported by the record.

## 1. Barseghyan's arrival at the hospital

The BIA and IJ determined that Barseghyan provided inconsistent testimony regarding how he got to the hospital after being tortured. In his written declaration, Barseghyan described that after he was beaten by government officials, "my health was deteriorating, I began losing time and orientation . . . I could not remember things. I was released

and went to the hospital where I was bed-ridden." On direct examination when asked who transported him to the hospital, he answered, "Those same policemen I believe, because of the condition that I was in perhaps they also became scared." On cross-examination, the government asked him about how he got to the hospital and suggested he took himself. Barseghyan again answered that the police took him and that he came to his senses at the hospital.

Barseghyan contends that there is no inconsistency, and we agree. His written declaration does not specify how he arrived at the hospital (just that he went there), and the fact that his written declaration describes that he was "bed-ridden" at the hospital shows that he was in no condition to transport himself. The first mention of Barseghyan transporting himself to the hospital appears not in something that Barseghyan said or wrote but rather in the government's framing on cross-examination: the government added that Barseghyan's declaration "says that you were released and you went to the hospital *on your own*." The BIA, in a footnote, acknowledged that Barseghyan never actually said in his declaration that he took himself to the hospital. This alleged inconsistency does not support an adverse credibility determination because it is not, in fact, inconsistent. *See Kumar*, 18 F. 4th at 1154.

## 2. Barseghyan's first arrest

The second inconsistency the IJ and BIA relied upon is whether Barseghyan was arrested at his home or the police station on January 23. In his written declaration, Barseghyan stated that the police arrested him inside of his house on January 23 but that he was "questioned and released." He explained that he "was told that [he] will be called for additional questioning" and that a week later he was "called back" to the police. On direct examination, Barseghyan

testified that he was called to the police station on January 23. This topic did not come up in cross-examination, but the IJ asked Barseghyan about it near the end of the hearing and gave him the opportunity to explain why his declaration stated that he was arrested inside his house, but his testimony described that he was called to the police station on January 23. Barseghyan initially confirmed that the police called him by phone on January 23, but then clarified that the "second time was the phone call" and he "forgot that they came to my home January 23rd and then it was a phone call, later."

Barseghyan contends that his declaration and testimony are consistent and that he was describing two different encounters with the police, while the IJ thought he was describing a single encounter. He explains that in the first encounter, on January 23, he was arrested at his home and went to the police station for questioning, after which he was released. In the second encounter, he was called by the police and went to the station. This explanation is supported by his written declaration, in which he wrote that he was arrested at home but "questioned and released," and a week later was called "back" to the police station. In common usage of the English language, one cannot be "released" from their own home, nor could a person be "called back" to the station if the person had been only arrested and questioned at home. But Barseghyan nevertheless testified on direct examination that he was "called to the police" on January 23, conflicting with his explanation of being arrested at home and then questioned at the station. When pressed by the IJ to explain the discrepancy at the hearing, Barseghyan stated that he "simply forgot that they came to my home January 23rd." While "this may very well have been an honest answer," it is "hardly an explanation for the inconsistency." *Kumar*, 18 F.4th at 1054. Under the

deferential review we give to the BIA's factual findings, we conclude that this inconsistency is supported by the record.

### 3. Barseghyan's ability to leave the country

The IJ and BIA relied upon third a purported inconsistency about whether the police were looking for Barseghyan when he left the country. On direct examination, Barseghyan stated that the police wanted to "see" him again and said they would call him back for more questioning. On cross-examination, the government attempted to cast doubt on this statement by emphasizing that other government officials at the airport allowed him to leave the country. Barseghyan explained that at that time, the police were not actively looking for him, and he "could leave the country."

We agree with Barseghyan that this is not an inconsistency that supports an adverse credibility determination. The fact that the police were aware of Barseghyan's phone number and address, and that he came to the police station for questioning the last time they called him, supports his answer that the police wanted to see him again but were "not looking" for him. In *Chouchkov v. I.N.S.*, 220 F.3d 1077, 1083 (9th Cir. 2000), we held that substantial evidence did not support the BIA's decision where the BIA assumed the Russian KGB and the police "are all on the same page and operate with seamless efficiency" and were working "in tandem." Similarly here, that other government officials allowed Barseghyan to board a plane does not make his testimony inconsistent.

### 4. Barseghyan's display of anti-government artwork

The BIA also relied upon an inconsistency regarding whether Barseghyan distributed the anti-government

drawings at a bazaar or traveled around to many villages with the drawings. The BIA erred in relying on this inconsistency because the IJ did not rely on it. *See Zumel v. Lynch*, 803 F.3d 463, 475 (9th Cir. 2015) ("[T]he BIA may review an IJ's factual findings only to determine whether the findings are clearly erroneous . . . [T]he BIA may not make its own findings or rely on its own interpretation of the facts.") (citation and internal quotation omitted).

But even if we considered it, this inconsistency does not support the adverse credibility determination because it is not actually inconsistent. Barseghyan's oral and written testimony describe that in the weeks leading up to the election, he was "going around and reminding people" of the government's violence and corruption, and the first time that his anti-government drawings caused a problem was when he showed them at a bazaar on January 19, 2013.

The government manufactures a discrepancy by characterizing the factual situation as an "either/or" situation: either Barseghyan traveled around to villages, or he showed the drawings at a single bazaar. On cross-examination, the government asserted that Barseghyan's "written statement says that you *just* showed those [drawings] to people at the bazaar" and asked him to explain. Like with the first inconsistency, the government again added something to Barseghyan's written declaration that is not actually contained in it. Barseghyan's testimony consistently and sufficiently explained that in the weeks leading up to the election, he was going around and reminding people of the government's corruption, and that the first time he had a problem showing the drawings was on January 23, a few days after showing them at a bazaar.

This inconsistency does not support an adverse credibility determination for yet another reason: the BIA did

not provide a specific reason for rejecting Barseghyan's reasonable explanation for it.  Before relying upon a purported inconsistency to make an adverse credibility determination, the fact finder must provide the applicant with an opportunity to explain each inconsistency.  *Rizk*, 629 F.3d at 1088.  If the applicant gives a "reasonable and plausible" explanation, the fact finder must state a "specific and cogent" reason for rejecting it.  *Id.*  Here, the BIA explained that it "agree[d] with the Immigration Judge" that Barseghyan's explanation "is not persuasive."  This mischaracterizes the record, as the IJ made no such finding. But even if the BIA had not relied upon a statement the IJ did not make, neither the BIA nor the IJ provided a "specific and cogent" reason for rejecting what appears to be a "reasonable and plausible" explanation from Barseghyan. *Id*.

## C.

In addition to the alleged inconsistencies, the IJ also relied upon the "lack of supporting documentation and the weakness of the supporting documentation" to make its adverse credibility determination.  Substantial evidence does not support the IJ's reliance upon the lack of or weakness of Barseghyan's documentation as a basis for finding him not credible because the IJ categorically ignored the documents that were consistent with his testimony.  The IJ did not address the hospital record confirming that Barseghyan was hospitalized on January 31, 2013.  Nor did the IJ mention the statement submitted by a neighbor who was at the political demonstration with Barseghyan and helped him after he was attacked by the police.  This document is an individual statement made by someone with personal knowledge of the events, satisfying two bases the IJ gave for affording little weight to the document Barseghyan submitted on behalf of

other neighbors. By ignoring documents consistent with Barseghyan's testimony, the IJ did not consider "the totality of the circumstances" when making its adverse credibility determination. 8 U.S.C. § 1158(b)(1)(B)(ii); *see also Shrestha*, 590 F.3d at 1044 (concluding that ignoring "relevant record evidence would be to make a credibility determination on less than the total circumstances in contravention of the REAL ID Act's text.").

The BIA further erred by misinterpreting the IJ's holding. The IJ relied upon the lack of documentation as one factor supporting its adverse credibility determination under 8 U.S.C. § 1158(b)(1)(B)(iii). The BIA erroneously characterized the IJ's holding about documentation as a finding under a different statutory provision, 8 U.S.C. § 1158(b)(1)(B)(ii), that Barseghyan did not provide sufficient corroborating evidence to sustain his burden of proof "independent of his own non-credible testimony." This part of the BIA order cannot stand because it is not supported by the record. For a determination under section 1158(b)(1)(B)(ii), the IJ must first determine that corroborating evidence is required and give notice of the specific corroboration required. *Ren v. Holder*, 648 F.3d 1079, 1091–92 (9th Cir. 2011). The IJ failed to take these steps here, reinforcing that it made no finding under section 1158(b)(1)(B)(ii). The BIA thus erred by affirming a finding that the IJ did not make.

To summarize, all but one inconsistency the IJ relied upon in making its adverse credibility determination are not actually inconsistent. The BIA erred by adding a fourth inconsistency upon which the IJ did not rely. And the BIA erred by misconstruing the IJ's holding about Barseghyan's documentation. We grant the petition and remand for the BIA to determine whether the remaining inconsistency,

regarding whether Barseghyan was arrested at home or the police station on January 23, 2013, is sufficient to support an adverse credibility determination. In *Alam*, we declined to decide how many inconsistencies require sustaining or rejecting an adverse credibility determination. 11 F.4th at 1137. Instead, we held that an adverse credibility determination must be supported by substantial evidence in light of the totality of the circumstances and all relevant factors. We again decline to engage in line drawing here and emphasize that all but one inconsistency relied upon by the BIA in upholding the adverse credibility determination against Barseghyan are not supported by the record. *See Kumar*, 18 F.4th at 1156. We remand on an open record so that the government and Barseghyan can provide additional evidence if they choose. We do not reach the BIA's holding about Barseghyan's eligibility for protection under the Convention Against Torture because it was based upon the IJ's adverse credibility determination and should be reviewed further on remand.

**PETITION GRANTED and REMANDED.**